Timothy Patrick Dillon (SBN 123953)
LAW OFFICES OF TIMOTHY P. DILLON P.C.
707 Wilshire Boulevard, Suite 3600
Los Angeles, California  90017
(310) 553-9400; (310) 553-9405 Facsimile
timothy@dillonlaw.net

James C. Bradley (SC Bar No. 16611) (to be admitted *Pro Hac Vice*)
Richardson, Patrick, Westbrook & Brickman, LLC
1017 Chuck Dawley Blvd. (29464)
Post Office Box 1007
Mount Pleasant, South Carolina 29465
843-727-6500; Fax: 843-881-6183
jbradley@rpwb.com

J. Wiley Horton (FL Bar No. 59242) (to be admitted *Pro Hac Vice*)
Pennington, Moore, Wilkinson, Bell & Dunbar, P.A.
215 S. Monroe Street, 2nd Floor
Tallahassee, Florida 32301
850-222-3533; Fax: 850-222-2126
wiley@penningtonlaw.com

Guy M. Burns (FL Bar No. 0160901) (to be admitted *Pro Hac Vice*)
Johnson, Pope, Bokor, Ruppel & Burns, LLP
Post Office Box 1100
Tampa, Florida  33601-1100
813-225-2500; Fax: 813-223-7118
guyb@jpfirm.com

Attorneys for Plaintiff
GLOBAL COMMUNICATIONS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| GLOBAL COMMUNICATIONS, INC., | Case No.  CV14-9951 |
| Plaintiff, | **COMPLAINT** |
| vs. | 1. Contributory Patent Infringement<br>2. Direct Patent Infringement |
| ZCWC INC. and ZINWELL CORP., | DEMAND FOR JURY TRIAL |
| Defendants. | |

COMPLAINT

1        Plaintiff Global Communications, Inc., for its complaint for patent

2   infringement against Defendants Zinwell Corp. and ZCWC Inc., alleges the

3   following upon personal knowledge as to itself and its own acts and upon

4   information and belief as to all other matters.

5   THE PARTIES

6        1.    Plaintiff Global Communications, Inc. ("Global"):  Global is a Florida

7   corporation having its principal place of business in Tallahassee, Florida, and it is

8   the holder of certain patents as described in this Complaint.

9        2.    Defendant ZCWC Inc. ("ZCWC"):  Upon information and belief,

10  ZCWC is a corporation duly organized and existing under and by virtue of the

11  laws of the State of California.  ZCWC has its principal place of business in City

12  of Industry, California and has imported from Zinwell and/or supplied accused

13  equipment in this judicial district for eventual use in DIRECTV's satellite

14  receiving systems.

15       3.    Defendant Zinwell Corp. ("Zinwell"):  Upon information and belief,

16  Zinwell is a Taiwanese company transacting business in the State of California and

17  within this judicial district.  As alleged more fully below, Zinwell has

18  manufactured and/or supplied the accused equipment through shipments and

19  deliveries in this judicial district for use in DIRECTV's satellite receiving systems.

20       4.    Defendants Zinwell and ZCWC are herein collectively referred to as

21  "Defendant Suppliers".

22  JURISDICTION AND VENUE

23       5.    Jurisdiction in this Court is proper for the following reasons, among

24  others: (1) this action involves citizens of different states and the amount in

25  controversy exceeds $75,000 (28 U.S.C. §1332) and (2) this action arises under the

26  federal patent laws (28 U.S.C. §1338(a)).

27       6.    Venue in this Court is proper because, among other reasons, the

28  events giving rise to this action occurred in this jurisdiction.

1
COMPLAINT

7.    All conditions precedent to bringing this suit have been satisfied or excused.

RELEVANT PROCEDURAL BACKGROUND

8.    In 2012, Global filed an action against both Zinwell and ZCWC in the Northern District of Florida in *Global Communications, Inc. v. DirecTV, Inc., et al.*, case no. 4:12-cv-00651-RH-CAS (the "Florida Action"), and both raised the defense of lack of personal jurisdiction.

9.    The Court in the Florida Action, on September 29, 2014, issued an "Order Dismissing the Claims Against Zinwell and ZCWC," based on the Court's finding that "these defendants are not at home in Florida and have had no contacts with Florida relating in any way to the accused equipment."

10.    Global has now sued Zinwell and ZCWC in this jurisdiction based upon their presence and acts in this judicial district.

11.    Any applicable statute(s) of limitations has been tolled during the pendency of the Florida Action.

GENERAL ALLEGATIONS

12.    Global was formed in the 1980's to develop technology and hardware relating to the home satellite television market.

13.    Global has consistently sought to develop, patent, and market new technology.

14.    The home satellite television market began as unauthorized interception of satellite broadcasts intended for network affiliates.  In the late 1980s, the signals were scrambled, and a system whereby subscribers would pay for the use of set-top descramblers was created. However, the subscriber service was a "by-product" of a technology that was not designed for home use.

15.    In the early 1990s, several companies sought to develop a satellite television system that was specifically designed for home use. The first operational system was launched by SkyPix in 1992 to limited success.

2<br>COMPLAINT

16.     Around the same time period Hughes Communications, Inc., an established satellite communications provider, decided to enter the home satellite television market.  Hughes called its system "DirecTV."  By 1994, Hughes had launched two high-powered Ku-band satellites designed specifically for its DirecTV system.

17.     The DirecTV satellite signal is received by a relatively small dish mounted on or near the exterior of a subscriber's home.  The dish includes a focusing reflector that concentrates the satellite's signal to a feed horn.  A low-noise block converter ("LNB") then selects a subset of the available satellite signals as directed by a television "set top box" (alternatively referred to as an "STB" or a "receiver") and feeds them into a coaxial cable.  The coaxial cable transmits the signals to the controlling STB.  The STB actually decodes the signals and creates the video images displayed on the user's television.

18.     The frequencies used for satellite communications (typically in the 10-20 gigahertz range) are not suitable for transmission over a coaxial cable between the dish and the receiver.  They must be converted to much lower frequencies – typically 950-1450 megahertz - in a process that is commonly referred to as "down converting."  Circuitry associated with the LNB often performs the down converting.  For this reason, an LNB is sometimes referred to as a low-noise block *down* converter.

19.     Early in the development of home satellite technology, Global realized a significant shortcoming in the systems being developed.  The selection of the subset of signals down converted by an LNB is actually controlled by the set top box. When a user selects a particular channel, the LNB has to select the appropriate subset of data available on the feed horn for that channel.

20.     This arrangement created a one dish/one television paradigm.  Each dish had to be linked to a single receiver that controlled it.  Unlike the existing cable systems, a user having two or more televisions feeding from the same dish

COMPLAINT

had no ability to independently select the channels for each television.  While a single dish could feed multiple televisions, all televisions would receive the same program.

21.    The problem was even worse for multi-dwelling units ("MDU's") such as apartment complexes and condominiums.  MDU owners had reached arrangements with cable providers to provide independent service to each residential unit.  In order to provide such a service using a satellite system, a separate dish had to be provided for each individual residential unit and each dish had to have a clear line of sight to the satellite.

22.    Global foresaw the problems that dish satellite television systems would encounter in seeking to displace cable installations for homes with multiple television sets and for MDU's.  Even before the creation of dedicated home satellite systems, Global was working on a solution to this multi-receiver problem.

23.    Global developed hardware specifically designed for digital downlink satellite signals (as opposed to the analog signals that had existed in the satellite communication world prior to the early 1990's).  As an example, Global was the first company to successfully field a spectrum analyzer for field technicians to use in installing and correctly orienting digital dishes (its GS-1000 hardware).

24.    By late 1994, the home satellite television market had taken off. However, the single dish/single television problem persisted.  The problem stemmed from the inability to feed multiple signals from the LNB to the set top box on a single coaxial cable.

25.    Global developed technology to solve this problem.  On February 22, 1995, Global filed a patent application entitled "Satellite Broadcast Receiving and Distribution System" (U.S. Patent Application No. 08/838,677).  This application disclosed Global's "frequency stacking" technology which allows multiple satellite signals to be sent over a single coaxial cable.

26.    In the terminology used in U.S. patent prosecution, the February 1995

4

filing became a "parent" application for numerous "child" applications which disclosed additional improvements and developments made by Global.  The patents resulting from these filings have become known as the "Single Wire Patents" in written agreements between the Parties.  They are referred to as the Single Wire Patents because they pertain to various hardware and methods for controlling and transmitting multiple satellite signals over a single coaxial cable or optical fiber "wire." The technology embodied in the Single Wire Patents solved the one dish/one television problem, among other problems.

27.    Stated very simplistically, the Single Wire technology "stacks" multiple signals on a single coaxial cable by using a front-end "stacker."  The stacker is located on the input end of the coaxial cable.  The stacker assigns non-interfering frequency blocks to each signal that is to be fed onto the cable.  It then converts each raw signal to the desired frequency block before feeding it onto the cable. Multiple signals are then fed down the same cable.  They do not interfere because they reside in different frequency bands.  A particular STB typically only removes and decodes a signal that has been requested by a user.

28.    In early 1995, Global made contact with DIRECTV.  Global represented that it had developed a solution to the one dish/one receiver problem and offered to work with DIRECTV to integrate the solution into the existing system.  Over the next several months, Global provided technical information regarding its products to DIRECTV.

29.    In September of 1996, Global began advertising its Single Wire technology in *Private Cable & Wireless Cable* magazine.  Global received numerous responses and began discussing the licensing of its technology.

30.    Around the same time period, Global, Heifner Communications ("HCI"), and Foxcom began alpha testing Global's "Digital Wave" hardware with Foxcom's SDTV fiber-optic delivery system.  The combined system allowed MDU subscribers to choose between a traditional cable system, a satellite system,

1    or both (all within a single MDU environment and using a single coaxial cable to

2    each subscriber).

3           31.     In February of 1997, Global, HCI, and Foxcom again collaborated to

4    demonstrate the Single Wire technology in an integrated system.  The system was

5    demonstrated to Echostar, PrimeStar, and DIRECTV.  The same system was also

6    demonstrated at the Satellite Broadcasting and Communications Association

7    ("SBCA") show in Las Vegas (March of 1997).

8           32.     In September of 1997, DIRECTV undertook a detailed evaluation of

9    the system developed by Global, HCI, and Foxcom (the "combined Digital Wave

10   system").  DIRECTV gained access to and evaluated a fully operating system,

11   including all the hardware.  The persons involved in this testing were Dipak Shaw

12   of DIRECTV, Ivan Moore of HCI, Mor Allon of Foxcom, and Austin Coker of

13   Global.

14          33.     In October of 1997, *Private Cable & Wireless Cable* magazine ran a

15   cover story explaining the features of the combined Digital Wave system. The

16   magazine ran additional stories covering other facets of the Single Wire

17   technology in additional issues.

18          34.     Around the same time period, it was becoming apparent that phone

19   service providers having fiber optic networks would soon be able to provide

20   television programming as well.  The Single Wire technology offered advantages

21   in this field as well.  Accordingly, the combined Digital Wave system was

22   submitted to phone service providers such as Southwestern Bell for evaluation.

23          35.     Throughout this time period, Global continued to develop the Single

24   Wire technology.  Additional patent applications were filed regarding these

25   developments.

26          36.     In the latter part of 1997 and early 1998, Global personnel worked

27   with DIRECTV engineers to complete an operational system using the Single Wire

28   technology.

37.     HCI and Foxcom had access to Global's technology via its prior association with Global.  In 1998, Foxcom entered into a contract with California Amplifier, Inc. to produce the "stacked" LNB and down converter hardware for the Single Wire system.  Although this was done without Global's knowledge or consent, the result was that the "stacked" LNB technology became well known in the industry.

38.     Around this same time period, PrimeStar, Foxcom and WSNet (successor to HCI) installed a functioning system – using Global's patented technology – in a 300-unit MDU in the Chicago area.   A second large MDU using the same technology was installed in the San Francisco area.

39.     In the fall of 1998, Hughes Network Systems (an affiliate of DIRECTV) tested an integrated MDU solution including Global's Digital Wave system.  As a result of the success of these tests, Hughes showcased the system by feeding live signals to multiple demo receivers showing DirecTV and DirecPC services at the 1998 SBCA show in Nashville, Tennessee.

40.     In August of 1999, Global's Digital Wave product was selected as a *Private Cable & Wireless Cable* magazine's top 20 reader's choice award winner.

41.     By this time, the original DirecTV brand was owned by DirecTV, Inc., a subsidiary of Hughes Electronics Corp.  DIRECTV increased its market share by purchasing other companies.  One of the biggest purchases was its acquisition of PrimeStar.

42.     All satellite service providers seek to provide more channels to the customers.  Adding more channels generally requires adding more satellites.  As a result of its acquisitions and internal development, DIRECTV had at least three satellites providing service.

43.     Each satellite must be parked in its own orbit, and each must be offset somewhat from its neighbors.  In order to use a single dish to receive signals from multiple satellites, multiple feed horns are provided on a single dish.  The feed

COMPLAINT

horns are angularly offset on the dish so that each is pointed (using a reflection off the dish surface itself) toward a different satellite.  This arrangement exacerbated the existing problem of transferring the received data from the dish to the receiver.

44.     Global's Single Wire technology also provided a solution to the problem of feeding signals from more than one satellite through a single wire from a single dish.

45.     In 1998 and 1999, DIRECTV used Global's Single Wire technology. DIRECTV described Global's Digital Wave system as a very useful and reliable product.

46.     DIRECTV and its competitors offer satellite broadcast services to subscribing customers.  Each of those requires the installation of equipment that contains parts and technology covered by Global's Patents at the subscriber's location ("the infringing equipment").

47.     Since at least the early 2000's, DIRECTV has not actually manufactured any of the hardware used to receive and decode its satellite signals. Instead, DIRECTV relies upon third parties, including the Defendant Suppliers, to manufacturer the hardware and supply it to DIRECTV.  DIRECTV promulgates specifications for the hardware and third parties make the hardware according to the specifications and supply the equipment, either directly or through other third parties, to DIRECTV.

48.     Since at least as early as 2006, the hardware provided to DIRECTV customers has been provided under the brand "DirecTV" rather than the brand of the third-party that actually made or supplied it.  In fact, the same model of equipment is commonly made and supplied by several different third parties (pursuant to the same specification).  The identity of the manufacturer or supplier is not typically displayed on the hardware.  Instead, the hardware simply says "DirecTV."

49.     Each DIRECTV customer must possess and use hardware to receive

8

COMPLAINT

1  the DIRECTV satellite signals.

2  FIRST LAWSUIT AND 2004 SETTLEMENT AGREEMENT

3  50.   In October of 1989, Global filed a patent application covering a

4  switching system intended for use in multi-dwelling units such as apartment

5  buildings.  This patent pertained to a refrigerator-sized piece of equipment that

6  could be used to selectively provide older C-band satellite signals and other types

7  of signals to apartment tenants. The application was granted as U.S. Patent No.

8  5,073,930 ("the '930 Patent") in December of 1991.

9  51.   In or around 2003, Global became aware that DIRECTV was

10  installing hardware that fell under its '930 Patent in certain multi-dwelling units.

11  52.   Global raised its concerns with DIRECTV, but no resolution was

12  reached.

13  53.   In March of 2004, Global filed a complaint for patent infringement

14  against DIRECTV.  This complaint was filed in the Northern District of Florida. It

15  alleged infringement of the '930 Patent only.  No contention of infringement was

16  made as to the Single Wire Patents since–to Global's knowledge–there had been

17  no infringement of any of the Single Wire Patents as of that time.

18  54.   Global's contention that the '930 Patent had been infringed was

19  ultimately settled by a written agreement between DIRECTV and Global (the

20  "2004 Settlement Agreement").

21  55.   The 2004 Settlement Agreement is a confidential document that has

22  been filed separately under seal in the Florida Action.  *See* Florida Action, Dkt. ##

23  18, 19.

24  56.   Although the 2004 action between Global and DIRECTV only

25  concerned the '930 Patent, the subject of the Single Wire Patents was discussed

26  between the parties during the formation of the 2004 Settlement Agreement.

27  57.   In the final version of the 2004 Settlement Agreement, DIRECTV is

28  given an unequivocal license in perpetuity to the '930 Patent.  In addition, a full

9

COMPLAINT

1    and complete release is provided to DIRECTV regarding the '930 Patent.

2    58.    The 2004 Settlement Agreement also gave DIRECTV certain other

3    rights regarding the Single Wire Patents.

4    59.    At the time the 2004 Settlement Agreement was formed, both Global

5    and DIRECTV were aware that DIRECTV manufactured none of the receiving

6    hardware used by its subscribers, a fact that continues to be true at the time of

7    filing this Complaint.  Instead, DIRECTV relied on, and continues to rely on,

8    third-parties, including the Defendant Suppliers, to manufacturer the necessary

9    hardware and supply it to DIRECTV.  These third-parties, including the Defendant

10    Suppliers, are included in the definition of "DIRECTV Supporting Parties" in the

11    2004 Settlement Agreement.

12    60.    Under the 2004 Settlement Agreement, a mechanism is established to

13    create a license of the Single Wire Patents to a DIRECTV Supporting Party.

14    Specifically, Global is obligated to offer a license under the Single Wire Patents to

15    any DIRECTV Supporting Party, under commercially reasonable terms, limited by

16    a defined royalty cap.

17    61.    At the time the 2004 Settlement Agreement was formed, Global was

18    not aware of any DIRECTV Supporting Party actually using any technology

19    covered by the Single Wire Patents.  Thus, the provisions concerning the Single

20    Wire Patents concerned the governance of possible future activity rather than a

21    resolution of any existing or past activity.

22    62.    In spite of the limitations and restrictions imposed by the 2004

23    Settlement Agreement, DIRECTV has engaged and continues to engage

24    unlicensed third parties, including the Defendant Suppliers, to manufacture single

25    wire equipment and supply it to DIRECTV.

26    63.    Under the 2004 Settlement Agreement, DIRECTV has no right to use

27    a DIRECTV Supporting Party to manufacture Single Wire Patent hardware for its

28    use and benefit.  Instead, the 2004 Settlement Agreement creates a mechanism

1    whereby DIRECTV (or a DIRECTV Supporting Party) is able to negotiate within

2    a defined framework in order to *obtain* such a right.

3        64.    As will be set forth in subsequent paragraphs, DIRECTV itself has

4    acknowledged and ratified these provisions of the 2004 Settlement Agreement.

5    <u>CREATION OF 2007 LICENSE AGREEMENT UNDER THE</u>

6    <u>PROVISIONS OF THE 2004 SETTLEMENT AGREEMENT</u>

7        65.    In or around 2006, Global became aware that one of the DIRECTV

8    Supporting Parties was manufacturing equipment it believed fell under the Single

9    Wire Patents.  Specifically, Global became aware that National Antenna Systems

10   ("NAS") was manufacturing an "MFH-1 Advanced Satellite Distribution System."

11       66.    Like all the equipment sold for use in the DIRECTV system during

12   recent years, the MFH-1 Advanced Satellite Distribution System was sold under

13   the label "DIRECTV."  However, the equipment was actually manufactured by a

14   DIRECTV Supporting Party (NAS).  A small label on the rear of some of the

15   MFH-1 units identified the manufacturer as NAS.

16       67.    Global and DIRECTV negotiated and executed a license agreement

17   covering the Single Wire Patents under the mechanisms defined in the 2004

18   Settlement Agreement. That license agreement ("2007 License Agreement") is

19   confidential and has been filed separately under seal in the Florida Action.  *See*

20   Florida Action, Dkt. ## 18, 19.

21       68.    The 2004 Settlement Agreement unquestionably extinguished any

22   prior claims existing at the time it was signed (as it included a full mutual release).

23   Under the terms of the 2007 License Agreement, DIRECTV was granted a license

24   to make, have made, use, sell, offer to sell, lease, offer to lease, import or

25   otherwise engage in activity falling under the rights covered by the Single Wire

26   Patents from the time of the 2004 Settlement Agreement up through December 31,

27   2007.

28       69.    The 2007 License Agreement explicitly conveyed "have made" right

to DIRECTV (the right to have a third-party manufacture products on its behalf). Thus, the 2007 License Agreement covered DIRECTV Supporting Parties (such as NAS at the time) in addition to DIRECTV itself. However, by its terms, the license only persisted through December 31, 2007. To Plaintiff's knowledge, NAS no longer, and has not since the expiration of the 2007 License Agreement, manufactured equipment purchased by DIRECTV and assembled into functioning home satellite receiving systems.

70. Plaintiff attempted to negotiate with DIRECTV a renewal of the 2007 License Agreement after it expired, but DIRECTV refused to renew it and no further agreements have been reached between the parties.

<u>THE SINGLE WIRE PATENTS</u>

71. Several patent applications were filed covering the Single Wire technology (hereinafter "Single Wire Patents"). Most of these applications have now been issued as U.S. Patents. The following table presents the relevant information as to the twelve issued Single Wire Patents:

| Patent No. | Filing Date | Issue Date | Appl. No. | Reference Name |
|---|---|---|---|---|
| 5,805,975 | 4/9/1997 | 9/8/1998 | 838,677 | '975 Patent |
| 6,122,482 | 12/31/1997 | 9/19/2000 | 09/001,484 | '482 Patent |
| 6,334,045 | 7/21/2000 | 12/25/2001 | 09/621,464 | '045 Patent |
| 6,397,038 | 9/18/2000 | 5/28/2002 | 09/664,443 | '038 Patent |
| 6,917,783 | 12/17/2001 | 7/12/2005 | 10/016,119 | '783 Patent |
| 6,947,702 | 1/23/2002 | 9/20/2005; Reissue 5/3/2011 | 10/052,344; Reissue 95/000,293 | '702 Patent |
| 7,542,717 | 3/24/2005 | 6/2/2009 | 11/089,131 | '717 Patent |
| 7,826,791 | 12/10/2008 | 11/2/2010 | 12/314,439 | '791 Patent |
| 8,095,064 | 9/2/2010 | 1/10/2012 | 12/874,318 | '064 Patent |
| 8,165,520 | 5/13/2009 | 4/24/2010 | 12/464,969 | '520 Patent |

| 8,583,029 | 3/16/2012 | 11/12/2013 | 13/422,614 | '029 Patent |
| 8,666,307 | 12/2/2011 | 3/4/2014 | 13/310,379 | '307 Patent |

72.   Global is the owner by assignment of all the Single Wire Patents.

73.   Global has previously sought to license its Single Wire Patents to DIRECTV under the provisions of the 2004 Settlement Agreement.  No new license has been granted.  Following the expiration of the 2007 License Agreement between Global and DIRECTV, DIRECTV's continued promotion, sale and use of satellite systems incorporating the Single Wire Patents has been without the consent of Global.

74.   All conditions precedent have been satisfied or excused.

## THE ACCUSED EQUIPMENT

75.   Installed systems receiving DIRECTV programming now routinely include a single wire multiswitch, commonly referred to as a "SWiM" or "SWM."

76.   Some installations include an outdoor dish unit ("ODU") feeding a signal to one or more stand-alone single wire multiswitches.  In other installations, the single wire multiswitch in incorporated into the low-noise block assembly ("LNB") on the ODU.  In the latter case, the equipment is commonly referred to as a "SWM-LNB."

77.   Both a stand-alone SWM and a SWM-LNB are capable of frequency-stacking multiple signals on a single coaxial cable.

78.   The SWM-compatible accused equipment, which is manufactured and supplied to DIRECTV by the Defendant Suppliers, infringes the claims of the Single Wire Patents, including infringing the following specific claims:

| Patent  Number | Claim |
| --- | --- |
| 6,947,702 | 32,38 |
| 7,542,717 | 15, 16, 24, 28, 32 |

| Patent  Number | Claim |
|---|---|
| 7,826,791 | 1, 8, 20, 25, 34, 40 |
| 8,095,064 | 1 |
| 8,165,520 | 1, 8, 20, 25, 32 |
| 8,583,029 | 1, 15 |

79.     Global attempted to offer licenses to the DIRECTV Suppliers for Single Wire equipment but at the time could not identify the DIRECTV Suppliers, and/or the DIRECTV Suppliers have failed to acquire such licenses.

80.     All conditions precedent necessary to the filing of this action have been satisfied or excused.

<u>FIRST CAUSE OF ACTION</u>

(Contributory Patent Infringement)

PLAINTIFF, FOR A FIRST CAUSE OF ACTION,

AGAINST THE DEFENDANT SUPPLIERS FOR

CONTRIBUTORY PATENT INFRINGEMENT, ALLEGES:

81.     Plaintiff hereby incorporates by reference all prior allegations contained in this Complaint to the extent they are not inconsistent with the claim set forth in this cause of action.

82.     The Defendant Suppliers manufacture and/or import accused equipment into the United States.  The accused equipment is purchased and used by DIRECTV.  The accused equipment is especially made or especially adapted for use in the infringement of the Single Wire Patents.  The accused equipment infringes the claims set forth in paragraph 78 of this Complaint.  The accused equipment has no substantial non-infringing use.

83.     Global has been damaged by the actions of DIRECTV and the DIRECTV Supporting Parties, including the Defendant Suppliers.

84.     The actions of the Defendant Suppliers violate the provisions of 35

14

COMPLAINT

U.S.C. § 271(c).

85.     The Defendant Suppliers are aware and have been aware of, or should be and should have been aware of, the existence of the Single Wire Patents.

86.     The contributory infringement of the Single Wire Patents by the Defendant Suppliers has caused and is causing irreparable harm to Global.  Global is entitled to damages in an amount to be determined at trial as a result of the contributory infringement by the Defendant Suppliers and to entry of an injunction against further contributory infringement by the Defendant Suppliers.

<u>SECOND CAUSE OF ACTION</u>

(Direct Patent Infringement)

PLAINTIFF, FOR A SECOND CAUSE OF ACTION

AGAINST THE DEFENDANT SUPPLIERS FOR

DIRECT PATENT INFRINGEMENT, ALLEGES:

87.     Plaintiff hereby incorporates by reference all prior allegations contained in this Complaint to the extent they are not inconsistent with the claim set forth in this cause of action.

88.     The Defendant Suppliers make accused equipment that infringes the patent claims set forth in paragraph 78 of this Complaint and/or import such equipment into the United States and/or sell it to DIRECTV.

89.     Global has been damaged by the actions of the Defendant Suppliers.

90.     The Defendant Suppliers' actions violate the provisions of 35 U.S.C. § 271(a).

91.     The Defendant Suppliers are aware and have been aware of, or should be and should have been aware of, the existence of the Single Wire Patents.

92.     The Defendant Suppliers' infringement of the Single Wire Patents has caused and is causing irreparable harm to Global.  Global is entitled to damages in an amount to be determined at trial as a result of this infringement and to entry of an injunction against further infringement by the Defendant Suppliers.

WHEREFORE, Plaintiff Global prays for relief against the Defendants and requests that the Court enter judgment against Defendants and in favor of Plaintiff Global as follows:

A.   That the Court hold that Defendants have infringed, have induced the infringement of, and/or have contributed to the infringement of the '702, '717, '791, '064, '520, and '029 Patents;

B.   That the Court enter a permanent injunction against further infringement of, inducement of infringement of, and/or contribution to the infringement of the '702, '717, '791, '064, '520, and '029 Patents by Defendants as well as any of their officers, subsidiaries, employees, and affiliates;

C.   That the Court order Defendants to pay compensatory damages to Global pursuant to 35 U.S.C. § 284;

D.   That the Court deem this an exceptional case and award Global reasonable attorney fees and costs pursuant to 35 U.S.C. § 285;

E.   That the Court award damages in favor of Global and against Defendants based upon the causes of action alleged in this Complaint; and

F.   Such other and further relief as the Court deems just and proper.

COMPLAINT

1   Dated:  December 30, 2014    LAW OFFICES OF TIMOTHY P. DILLON P.C.

2                                 RICHARDSON, PATRICK, WESTBROOK
                                      & BRICKMAN, LLC

3                                 PENNINGTON, MOORE, WILKINSON, BELL
                                      & DUNBAR, P.A.

4

5                                 JOHNSON, POPE, BOKOR, RUPPEL
                                      & BURNS, LLP

6                                 By:_____/S/Timothy Patrick Dillon_____

7                                        Timothy Patrick Dillon

8                                 Attorneys for Plaintiff
                                 GLOBAL COMMUNICATIONS, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>DEMAND FOR JURY TRIAL</u>

2

Plaintiff Global hereby requests a trial by jury pursuant to Fed.R.Civ.P.

3

38(b) on all issues so triable.

4

5

Dated:  December 30, 2014          LAW OFFICES OF TIMOTHY P. DILLON P.C.

6

RICHARDSON, PATRICK, WESTBROOK
     & BRICKMAN, LLC

7

8

PENNINGTON, MOORE, WILKINSON, BELL
     & DUNBAR, P.A.

9

JOHNSON, POPE, BOKOR, RUPPEL
     & BURNS, LLP

10

11

By:_____/S/Timothy Patrick Dillon_____
          Timothy Patrick Dillon

12

13

Attorneys for Plaintiff
GLOBAL COMMUNICATIONS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18
COMPLAINT